**SO ORDERED.**

**SIGNED this 01 day of December, 2006.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| JOHNNY DEAN PRITCHARD, ) | Case No. 05-10608 |
| ) | **Chapter 7** |
| Debtor. ) | |
| _____) | |
| ) | |
| LARRY SORENSEN, TERESA SORENSEN, ) | |
| and JENNIFER PRITCHARD, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Adv. No. 05-5139 |
| ) | |
| JOHNNY DEAN PRITCHARD, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM OPINION

Plaintiffs seek to except two debts from debtor's discharge. Plaintiff Jennifer Pritchard asserts that a $1,000 attorney fee award entered against her ex-husband, Johnny Pritchard, in post-

1

divorce proceedings is nondischargeable under 11 U.S.C. § 523(a)(5). Plaintiffs Larry Sorensen and Teresa Sorensen assert that a loan made by them to their then son-in-law, Johnny Pritchard, to pay an income tax obligation of $9,192 is nondischargeable under 11 U.S.C. § 523(a)(14) and § 523(a)(1)(C). Trial on these discharge exceptions was held on July 18, 2006. Elizabeth Carson appeared on behalf of the plaintiffs. Sheila Maksimowicz appeared on behalf of the defendant. Following the close of evidence counsel submitted legal memoranda in support of their positions and the Court took the matter under advisement.

Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has subject matter jurisdiction.[1]

Findings of Fact

Johnny and Jennifer were married on January 12, 1993 and divorced on December 29, 2003. Larry and Teresa Sorensen are Jennifer's parents. Larry Sorensen loaned money to Johnny and Jennifer during their marriage, including a loan made in 2002 to pay a $9,192 income tax liability owed to the Internal Revenue Service (IRS). More detail surrounding that tax liability is set forth below.

In early 2004, after their divorce, Johnny and Jennifer returned to domestic court on motions to resolve child custody and property division issues, including the debt owed to Larry Sorensen.[2] Jennifer's motion alleged: "That an $11,000.00 debt owed to Larry Sorensen in order to pay certain taxes owed by the Petitioner [Johnny], was not resolved in the divorce and needs to be resolved."

---

[1] 28 U.S.C. § 157(b)(1) and § 1334(b).

[2] Ex. E.

2

The domestic court issued its opinion on July 2, 2004. A fair reading of the opinion clearly indicates that the domestic court considered and ruled on both child custody and property division issues. It states:

> The property issues deal primarily with loans made by the Respondent's father to the Petitioner and the unfinished residence. . . . The Respondent wants the residence and will be so awarded and will hold the Petitioner harmless for the mortgage thereon. . . .
>
> To even out the debt situation, the Petitioner will pay the remaining debt owing to Larry Sorensen on the $11,000.00 loan and hold the Respondent harmless therefrom. . . .
>
> The Respondent [sic] shall be responsible for $1,000.00 of the attorney fees of the Petitioner [sic].[3]

The domestic court directed that a journal entry be prepared and submitted. That journal entry was submitted and signed by counsel and the domestic court. Consistent with the opinion, the journal entry addressed the property issues as follows:

> 4. That the Petitioner [Johnny] is herby [sic] ordered to pay the debt owed to Larry Sorensen in the amount of $11,000.00 less all payments made by the parties during and since the marriage, plus interest at the legal rate from the date of the Court's opinion on July 2, 2004.
>
> 5. That the Petitioner is also ordered to pay the $2,800.00 loan owed to Larry Sorensen for the repairs of a vehicle less all payments made by the parties during and since the marriage, plus interest at the legal rate from the date of the Court's opinion on July 2, 2004.
>
> 6. That the Respondent shall be held harmless from both the $11,000.00 loan and the $2,800.00 loan by the Petitioner.
>
> 7. That the Petitioner is required to turn over all property in the possession of the Petitioner that belongs to the Respondent as set out in the exhibit presented to the Court by the Respondent.

---

[3] Ex. G, p. 3.

3

      8.     That the Court acknowledges the opinion filed on July 2, 2004, is incorrect in that that opinion states the Respondent shall be responsible for $1,000.00 of the attorney's fees of the Petitioner, and in fact that the Court orders that the Petitioner be responsible for $1,000.00 of the Respondent's attorneys fees.[4]

On their face, neither the opinion nor the journal entry expressly linked the award of attorney's fees to child custody or support. The documents are silent as to the nature of the attorney's fees award. As counsel for defendant pointed out in closing argument, the award of attorney's fees immediately follows the property division made by the domestic court.

The Court now turns to the circumstances giving rise to the Pritchards' tax liability and the ensuing loan from Sorensen during the Pritchards' marriage. In July of 1998, Johnny's father died. Johnny's father had worked as a guard at the Hutchinson Correctional Facility and left Johnny life insurance proceeds and his KPERS funds. Johnny testified that he received two checks totaling approximately $123,000 from the State of Kansas on account of his father's death. When Johnny's father died, Larry Sorensen, who had also worked at the Hutchinson Correctional Facility and was familiar with the employee benefits, explained to Johnny the possible death benefits he might expect as a result of his father's death. Larry told Johnny that some of the death benefits he might receive might be taxable but he did not indicate what sources were taxable and did not purport to give Johnny any tax advice.

Roger Pritchard, Johnny's brother, testified that he was involved in settling their father's estate. According to Roger, he met with Johnny and their other brother, Mark, after their father's death and discussed the payment of their father's final bills and taxes. The monies to be received from their father were to be divided among the three brothers after payment of the final bills and

---

[4] Ex. F, p. 2.

taxes. The monies were going to be sent to Johnny and he agreed to hold back $10,000 to $12,000 to cover taxes on the "inheritance." Johnny denies that this discussion occurred.

Johnny denies that he willfully evaded income taxes on the inheritance. He contends that he provided the information to his tax preparer and that the tax preparer erred in not including the inheritance as income in their 1998 tax return. Johnny testified that he delivered what he received from the State of Kansas to his tax preparer H&R Block. It is not clear from the record exactly what documentation Johnny provided to H&R Block. He described it as the two checks he received from the State of Kansas, but presumably all he had after cashing the checks would be the check stubs. He was told the life insurance check was not taxable. He denied receiving a Form 1099 from the State of Kansas for the tax year 1998. Whatever documentation he supplied to H&R Block, it was not offered as evidence at trial. Nor was the tax preparer called to testify. The tax preparer did not include as income in the Pritchards' 1998 tax return, the monies Johnny received upon his father's death. After H&R Block's preparation of the tax return, both Johnny and Jennifer signed it.[5]

The IRS transcript admitted into evidence indicates that additional tax, interest and penalty were assessed against the Pritchards in April 2001, resulting in a tax liability of $9,192.[6] No evidence was presented that Johnny went back to H&R Block after being assessed the additional tax, interest and penalty to question why the income had not been reported in their 1998 tax return or to request assistance in dealing with the IRS assessment. According to Jennifer, Johnny told her of the tax problem after receiving correspondence from the IRS that the IRS was going to collect the tax

---

[5] The Pritchard's received a refund of $3,072 on their 1998 tax return. Ex. 1.

[6] Ex. H. The transcript describes the penalty as an "accuracy penalty."

5

liability and would come after their house.[7] Johnny asked Jennifer for her paycheck and then asked Jennifer to call her parents for money to pay the taxes.[8] On May 12, 2002, Larry loaned Johnny $11,000 to pay the $9,192 tax liability and to pay off an existing loan that Johnny had with a bank.[9] The IRS transcript shows that the $9,192 tax liability was paid May 17, 2002. According to both Jennifer and Larry, a repayment plan was worked out between Larry and Johnny. Some repayments were in fact made but according to Larry, the payments received during the marriage totaled $3,715 and were applied to two earlier loans he had made to Johnny and Jennifer in the amount of $4,500 and $2,800, leaving the final loan of $11,000 unpaid.[10] In an order entered November 22, 2004, the domestic court determined that payments of $3,187 should be credited on the $11,000 loan, leaving a loan balance of $7,813.[11]

Following Johnny and Jennifer's divorce in December 2003 and the post-divorce wrangling over the remaining property and child custody issues throughout 2004, Johnny filed his chapter 7 bankruptcy petition on February 15, 2005. This dischargeability complaint followed.

Analysis and Legal Conclusions

**I. Attorney's Fees Awarded in Post-Divorce Proceedings – Section 523(a)(5).**

---

[7] This correspondence was not produced at trial. Nor was it clear from the testimony when Johnny told Jennifer about the tax problem.

[8] According to Roger's testimony, Johnny also called him after getting the notice from the IRS and requested that Roger pay his share of the taxes. Roger refused because Johnny was supposed to have set aside a portion of the monies to pay the taxes before distributing among the brothers.

[9] The clear inference from this time sequence is that Johnny waited more than a year before dealing with the tax problem.

[10] Ex. H.

[11] Ex. 3.

6

Jennifer contends that the $1,000 attorney's fee award assessed against Johnny in the post-divorce proceedings is in the nature of maintenance or support and therefore nondischargeable under § 523(a)(5), citing the Tenth Circuit decision *Jones v. Jones (In re Jones)*[12] as support. In *Jones,* the Court of Appeals considered wither court-ordered attorney fees arising from a post-divorce custody modification proceeding was in the nature of support and excepted from discharge pursuant to § 523(a)(5). The *Jones* court concluded that they were.

> Generally, custody actions are directed towards determining which party can provide the best home for the child and are, therefore, held for the child's benefit and support. Therefore, in order that genuine support obligations are not improperly discharged, we hold that the term "support" encompasses the issue of custody absent unusual circumstances not present here. Consequently, court-ordered attorney's fees arising from post-divorce custody actions *are deemed in the nature of support* under § 523(a)(5) as being incurred on behalf of the child. This debt is nondischargeable.[13]

In the case at bar, the post-divorce proceedings were not limited to child custody issues; rather the proceedings also determined property division.[14] Because of this key factual distinction, the Court concludes that *Jones* is not controlling here.

The attorney fee award at issue in this case was not characterized as support or property division. Even if it were labeled by the domestic court, the label attached to the obligation does not control. Instead, this Court must look to the intent of the parties and the substance of the obligation to determine whether the obligation is *actually* in the nature of alimony, maintenance or support.[15]

---

[12] 9 F.3d 878 (10th Cir. 1993).

[13] *Id.* at 882 (Emphasis added.).

[14] In the Court's view, the allocation of unsecured debt repayment responsibilities made in a divorce decree is ordinarily a division of the parties' property. The Court concludes that the domestic court's allocation of the debts owed to Larry Sorensen, therefore, was a division of property, not maintenance or support.

[15] *See Goin v. Rives (In re Goin),* 808 F.2d 1391, 1392 (10th Cir. 1987).

7

Jennifer's post-divorce motion sought not only residential custody of the children but also division of the $11,000 debt to Larry Sorensen, a legal description of the marital home awarded to her, and clarification of the car awarded to Jennifer.  Neither the domestic court's opinion nor the journal entry entered in this case shed much light on the parties' intent or the substance of the attorney's fee obligation.  The Court does note that the attorney's fee award is located immediately after the orders dealing with division of property.  At the trial of this matter, no evidence was presented bearing on the intent or purpose of the attorney's fee award.  The record is silent with respect to the various factors to consider in determining whether the obligation is support or maintenance.[16]  The Court is unable to conclude from the scant record before it that the attorney's fee award is actually in the nature of maintenance or support.  Since Jennifer, who bears the burden of proving by a preponderance of the evidence that the attorney's fee award is nondischargeable, has not made a sufficient showing of intent or the actual nature of the award, the Court must conclude that the $1,000 attorney's fee awarded to her is discharged in Johnny's bankruptcy.[17]  Judgment should be entered in favor of Johnny on this portion of the complaint.

> II. **Debt Incurred for Income Tax Debtor Willfully Attempted to Evade – Section 523(a)(14) and (a)(1)(C).**

Section 523(a)(14) excepts from discharge any debt incurred by a debtor to pay a tax claim that would have been excepted from the debtor's discharge under § 523(a)(1).  Accordingly, the

---

[16] *Id.* at 1392-93 (Pertinent factors include: (1) whether the divorce settlement explicitly provided for spousal support; (2) there are minor children and an imbalance of income; (3) the obligation is to be paid in installments directly to the recipient; and (4) the obligation terminates on remarriage or death.).

[17] *In re Jones*, 9 F.3d at 880 (The objector to discharge has the burden of proving by a preponderance of the evidence that a debt is not dischargeable.).

Plaintiffs had the burden of proving that (1) Johnny obtained the loan from his father-in-law, incurring the debt to pay the tax assessment; and (2) that the assessment occurred because he evaded the taxes by willfully failing to report the money or income he had received upon his father's death. This omission occurred despite the fact that Johnny was apprised that the "inheritance" he received might be taxable. As is typically the case in these type of proceedings, no direct evidence was presented that Johnny willfully failed to disclose the income he had received. For example, there was no testimony that Johnny made contemporaneous statements to his then-wife or anyone else that he was not going to report the income or that he had no intention of paying taxes on what he had received.

In interpreting § 523(a)(1)(C), the United States Court of Appeals for the Tenth Circuit has stated that willfully attempting "in any manner to evade or defeat such tax" means the voluntary, conscious or knowing and intentional attempt to evade payment of one's taxes, including concealment of assets. The Circuit Court has followed the interpretation given to this phrase in tax cases:

> Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.[18]

In a recent decision, Judge Karlin of this court has held that:

---

[18] *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1301 (10th Cir. 1996), quoting *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943).

9

Evidence of nonpayment alone does not, however, support a finding that a tax debt is nondischargeable. To defeat the discharge of the tax debt, the creditor must prove that the debtor willfully attempted to evade or defeat the tax, and that proof must contain both a "conduct" element, that the debtor has attempted in any manner to evade or defeat tax, and a "mental state" element, that he has acted willfully. The conduct required is that the debtor attempted in any manner to evade or defeat a tax, which can include either affirmative conduct or acts of culpable omission. The willfulness required under § 523(a)(1)(C) is met if the actions are done voluntarily, consciously, or knowingly and intentionally.[19]

In determining Johnny's conduct and mental state when he omitted the receipt of this $123,000 inheritance from his 1998 federal return, the Court is left to consider the circumstantial evidence presented at trial and to evaluate the credibility of the witnesses.[20] Several aspects of his conduct are damning. Most troubling is the evidence that was conspicuously absent. Johnny did not produce any documentation he received from the State of Kansas when he received his father's death benefits. He did not produce whatever documentation he allegedly provided to the tax preparer, which if believed, would have demonstrated that he disclosed the income to his tax preparer and it was the tax preparer's error in not reporting it. He did not call as a witness the tax preparer to testify concerning the preparation of the 1998 return. He did not produce the correspondence he purportedly received from the IRS giving him notice of the additional tax assessment. He did not explain what transpired in the one year delay between the assessment, obtaining the loan from Larry Sorensen, and payment of the tax assessment. And perhaps most troubling is the lack of any evidence that Johnny contacted his tax preparer after being hit with an additional $9,192 tax assessment to inquire why this error had occurred, particularly if the income

---

[19] *Mills v. United States of America, Internal Revenue Service (In re Mills)*, 337 B.R. 691, 699 (Bankr. D. Kan. 2005).

[20] *Id.* (Significant understatement of income may be a willful attempt to evade a tax.).

had been disclosed to the tax preparer as Johnny asserts. Given all of these holes in the evidence, the Court concludes that Johnny's testimony was simply not credible.

On the other hand, the Court heard from Johnny's brother, Roger, who had no apparent motive to lie or to testify against his brother. The Court found Roger's testimony to be credible and forthright. Roger had an understanding with Johnny that a portion of the money received upon their father's death would be set aside by Johnny to pay any taxes that resulted. That obviously never transpired. The fact remains, however, that Johnny clearly contemplated the tax liability. The Court concludes that it is more probable than not that Johnny knew his inheritance would be subject to tax, that he agreed to set some of it aside to pay the taxes, and that he never disclosed the inheritance to the tax preparer. He signed the 1998 tax return that made no mention of this sizeable bit of income, suggesting his intent not to report it to the IRS. Accordingly, the Court concludes that Johnny incurred a debt to pay a tax that he willfully attempted to evade. The debt to Larry Sorensen is therefore excepted from Johnny's discharge under § 523(a)(14) and § 523(a)(1)(C). Judgment should be entered in favor of the Sorensen plaintiffs on this claim.

This leaves for the Court a determination of the amount of the debt that is nondischargeable. Because the $11,000 loan obtained by Johnny included obligations other than the tax debt, the full amount of the $11,000 debt should not be excepted from discharge.[21] The amount of the nondischargeable debt admits of several possibilities. One, it could be the principal amount of the tax debt – $9,192, which assumes that any repayments Johnny made on the loans were credited on

---

[21] Of the $11,000 loan, $9,192 was attributable to the tax debt. This equates to 83.5 per cent of the total debt.

11

earlier loans and not the last $11,000 loan.[22] This is the position that plaintiffs take. Two, it could be the amount of the debt owed to Larry Sorensen as determined by the domestic court after giving credit for repayments. This amount is $7,813.[23] Three, it could be the proportion of the tax debt to the total loan obligation (83.5%) as the domestic court determined remained unpaid after application of payments. This would have the effect of applying the credits proportionately to the tax debt portion of the loan and the non-tax portion of the loan. This is the position that defendant apparently takes. Under defendant's theory, the amount of the nondischargeable debt is $6,530.85.[24]

This Court is persuaded by the domestic court's application of the credits against the loan balance in determining the extent to which Larry Sorensen may be granted judgment. While the Court is nominally attracted to the proportional approach to calculating what remains to be paid Sorensen on his debt, the common law of payments as it is applied in Kansas controls the issue. The general rule applied in Kansas with regard to application of payments in debtor-creditor relations is as follows:

> "'It is the law that a debtor who owes two or more accounts to a creditor may direct to which account any money which he voluntarily pays shall be applied. It is also the law that when the debtor pays without directing to which of his accounts his payment

---

[22] *See* Ex. J. Plaintiffs also compute prejudgment interest based upon the credit card rate Larry Sorensen incurred after advancing the funds on May 12, 2002. Under § 502(b)(2) the accrual of interest should terminate on the date of the debtor's bankruptcy petition, February 15, 2005.

[23] *See* Ex. 3. The domestic court credited payments of $3,187 against the $11,000 loan. There was no evidence presented to this Court that any payments were made by Johnny on the debt after his marriage to Jennifer ended or after the domestic court's ruling. The dates and amount of the repayments were not shown by plaintiffs at trial.

[24] 83.5 percent of the credits recognized by the domestic court in its November 22, 2004 order equals $2,661.15 [$3,187 x .835]. Crediting this portion of the repayments to the tax debt portion of the $11,000 loan leaves a balance owed of $6,530.85 [$9,192 - $2,661.15] on the tax debt.

12

shall be applied, the creditor has the privilege of applying the sum paid to either of the accounts.' " *Neal v. Gideon*, 157 Kan. 1, 4, 138 P.2d 419 (1943), citing from *Lumber Co. v. Workman*, 105 Kan. 505, 509, 185 P. 288 (1919).[25]

In the absence of any evidence of either an agreement between Johnny and Sorensen regarding how the pre-divorce payments were to be applied or that Johnny directed their application in a certain manner, the Court reasons that the previous payments were applied first to the discharged debts, leaving the sum of $7,813 remaining due on the nondischargeable portion of Sorensen's debt, said amount to bear interest at the legal rate and accruing from the date of the domestic court's determination (November 22, 2004) until paid.[26] The parties testified before the domestic court concerning the payments made on the loans and had every opportunity to present testimony regarding their application, the loan balances and credits. The Court sees no reason to relitigate that issue here. Johnny's debt to the Sorensens in the amount of $7,813 is excepted from his discharge.

A Judgment on Decision shall issue this same day.

# # #

---

[25] *In re Bulk Sale of Inventory, Furniture, Fixtures, Vehicles, and All Other Assets of Hart's Transfer and Storage, Inc.*, 6 Kan.App.2d 579, 581, 631 P.2d 258 (1981).

[26] KAN. STAT. ANN. § 16-201 (1995).

13

Case 05-05139   Doc# 47   Filed 12/01/06   Page 13 of 13